Mrs. Albert REDGATE et al., Plaintiffs,

v.

**BOSTON REDEVELOPMENT AUTHOR-
ITY and Thomas Eisenstadt, Sheriff,
Suffolk County, Defendants.**

Civ. A. No. 69–1103–F.

United States District Court,
D. Massachusetts.

Oct. 27, 1969.

Edmund E. Fleming, Brian M. Olm-
stead, Boston, Mass., for plaintiffs.

Daniel B. Bickford, Ely, Bartlett,
Brown & Proctor, Boston, Mass., for
Boston Redevelopment Authority.

Antonio DeJ. Cardozo, Cardozo &
Tucker, Boston, Mass., for Zalesky.

Before ALDRICH, Circuit Judge, and
FORD and BOWNES, District Judges.

ALDRICH, Circuit Judge.

This is a motion to. stay, pending a
hearing and decision of a three-judge
court upon the constitutionality of a
state statute under which the defendant
Boston Redevelopment Authority, BRA,[1]

---

1. The Sheriff of the county is an additional party, but may be disregarded for the purposes
of this opinion.

is seeking to evict the plaintiffs from houses taken by eminent domain in 1964 and in which plaintiffs have since been living without permission and without payment of rent. The case was originally addressed to a single district judge, who granted a temporary restraining order as of course on receiving the complaint and then, after two days of hearing testimony, revoked it. That same afternoon plaintiffs appealed to the Court of Appeals, and sought a stay from the Chief Judge, who commenced an immediate hearing, while the defendant, at the request of the court, stipulated to an informal stay. The hearing was continued the next day, following which the stipulation was continued, and a three-judge district court was constituted. The next day, Friday, October 24, a hearing was held by this court on the matter of the issuance of a formal stay.

The reason for this immediacy is to be found in the facts. The BRA is under contract and is endeavoring to erect a 210–unit non-profit, low rental project, costing approximately $5,000,000., sponsored by a multi-denominational group of local churches and a synagogue. The last day upon which delivery of the cleared site must be made to the contractor is Monday, November 3. If this delivery is not effected the contract, at best, must be renegotiated at, without question, substantially increased cost and delay, because of the onset of winter.

Any increase whatever in cost will cause the project to exceed the federal authorization. There is no certainty that this can be enlarged even with a delay, and considerable danger that it could not be. The single judge found,

"Continuance of the restraining order would seriously endanger the start of a project providing low cost housing for over two hundred families, to the general detriment of the community * * * [and] would cause irreparable harm to the Boston Redevelopment Authority."

■ We come, then, to the problem. Plaintiffs assert that the statute, which, they concede, resulted in a lawful taking of their property in 1964 (a matter the most presently conspicuous of them contested in the state court some while back) is unconstitutional because it does not provide for a hearing in connection with the requirement that they vacate the premises, but provides merely for a 30-day notice to quit.[2] Plaintiffs say that had they received a hearing it could be made to appear that under certain regulations which they say are applicable they should have received 90 days' notice, rather than 30, and would have had an opportunity to show that they had not been offered suitable housing accommodations to move into, as required by the removal plan that was an integral part of the taking.[3]

■ Plaintiffs alternatively allege that they were denied equal protection

2. The statute is in two paragraphs. The first provides for eminent domain taking, and is not attacked. The allegedly offensive paragraph reads as follows.
  "If the person in possession of property which has been taken in fee, or in which an assement has been taken, by eminent domain under this chapter refuses to permit the body politic or corporate by which the taking was made to enter thereon and take possession thereof or to exercise its rights under the taking after thirty days' notice in writing sent to him by registered mail or posted upon the property so taken or in which an easement has been so taken, the board of officers having the direction and control of the public improve-

ment in connection with which the taking was made may issue its warrant to the sheriff of the county in which the property is situated or to his deputy directing him to make entry on the property so taken and to take possession thereof or of the easement therein which has been taken, on behalf of said body politic or corporate, and such sheriff or his deputy shall forthwith execute said warrant using such force as he may deem necessary for the purpose." Mass.G.L. c. 79 § 3.

3. They also stress in their extensive oral argument that they would have had the satisfaction of receiving constitutional due process.

of the laws because a Massachusetts statute, G.L. c. 239 § 9, provides that a tenant may, in the discretion of the court, obtain a stay of eviction up to six months, a right which chapter 79 does not give them. The claim that plaintiffs are tenants, when they have no lease, oral or written, have paid neither rent nor taxes for four years, and have received nothing from the owner of the premises except a prior demand that they quit delivered in 1965, stretches the meaning of tenancy to its limits. Plaintiffs have been allowed to stay merely because BRA has not needed the property. It has been moving out other occupants, some sixty in number, who have gone voluntarily, and has not previously joined issue with the present five plaintiffs, whose attitude has made it apparent that voluntariness was not for them.[4]

The equal protection claim, that plaintiffs were entitled to the same procedure as that afforded to tenants occupying under a lease, overlooks the fact that the Massachusetts tenancy statute expressly exempts from its terms evictions for non-payment of rent. Furthermore, all the tenancy statute provides is a discretionary extention. The urban redevelopment statute gives less absolute time, but it imposes on the authority the duty to find suitable relocation facilities. This claim is totally frivolous.

Before we reach the substantive question of the unconstitutionality of the statute because it fails to provide for a hearing, or, more exactly, the probability of eventual success which plaintiffs must establish in order to obtain a stay, we must consider, what the writer of this opinion advised counsel from the outset was an issue, the standing of these plaintiffs, in the light of their past conduct, presently to seek an injunction. This requires a further factual statement.

On August 22, 1969 BRA sent each of the plaintiffs by registered mail a notice to quit in 30 days pursuant to the terms of the statute. Plaintiffs refused to receive the letters, and they were returned, unopened. Plaintiffs' counsel candidly concedes that this was in accordance with plaintiffs' long established custom not to pay attention to communications from the BRA. Counsel also concedes, as he must, that plaintiffs had no knowledge whether the letters contained 30-day notices, 90-day notices, or even advice of unexceptionable opportunities to relocate. In connection with this latter subject, the evidence is undisputed that many discussions were sought to be had with plaintiffs on the subject of relocation, but plaintiffs were uniformly "uncooperative." [5]

In answer to the court's remark on the subject of plaintiffs' refusal to accept communications from the BRA, that evidently plaintiffs "didn't care what the BRA might have to say," counsel protested, but supplied no substance to support the protest.

During early September, following the refusal of the registered letters, 30-day notices in accordance with the statute

4. It was only on the second day of the second hearing, viz., that held before the writer of this opinion sitting as single judge of the Court of Appeals, that the court was able to obtain any indication from counsel that their clients had any intention of cooperating. This statement was that they would cooperate to the extent of leaving voluntarily after their legal rights had been exhausted. The proviso, as became more evident later, meant something substantially more than being offered suitable relocation facilities.

5. The single judge, following the original hearing, found as follows.

"That ample and frequent opportunity had been presented to them by agents of the Boston Redevelopment Authority to relocate the petitioners before any attempt to evict them was made, and that the petitioners have refused to cooperate in any way with the efforts of the Boston Redevelopment Authority."

Plaintiffs disagree with this finding. For purposes of this decision we need not assume it is correct in all of its aspects. The facts stated in the body of our opinion are presently sufficient.

were served upon the plaintiffs in hand, or at the premises, by a constable. The notices, both the ones refused, and the ones served, stated that plaintiffs were to vacate within 30 days, and quoted the statute, n. 2, *supra,* to the effect that on refusal to comply they faced eviction by force. In addition, plaintiffs were informed in writing of offers of relocation. To these, too, plaintiffs made no response.

Plaintiffs presently state, through counsel, that the rents involved in the offered facilities were too high, but even this much reply was not made until they got into court. When, in response to court questioning on the aforesaid second hearing on the stay, it was brought out that plaintiffs had as of the day before, received offers in public housing in which the rent was very small, plaintiffs replied, through counsel, that they had heard that this housing was unclean, exposed to vandalism, and had a leaky roof. Pressed further, whether any offer, including temporary hotel accommodations pending the finding of suitable permanent housing, would satisfy plaintiffs, counsel replied that his clients would rather stand on their legal rights.

Finally, whatever may be thought the deficiencies in respect to the actual offers of relocation prior to the court hearing, two days of testimony before the single judge brought forth no evidence that plaintiffs have ever made any attempts on their own to secure other accommodations, or to seek assistance from the representatives of the BRA, who constantly maintained a trailer on which it was advertised that this was their offer and responsibility.

To go back, it is perhaps not fully accurate to say that plaintiffs took no action as a result of the notices to quit. At some point they consulted Boston Legal Assistance counsel. On October 17, the day that the sheriff arrived with equipment to remove plaintiffs from the premises by force after more than 30 days from the served notices

had expired, the plaintiffs filed the instant complaint and obtained the forthwith restraining order against eviction from the single district judge. Because of the effect that certain language of the complaint had on the court, and the ensuing newspaper publicity unfavorable to the BRA which matters of this kind naturally attract, we quote two paragraphs of the complaint.

"2. Mass. Gen Laws Ch. 79, Sec. 3 provides that a public body, after giving thirty days notice to a person, can issue its warrant directly to the sheriff of the county in which the property in question lies, and that that sheriff must then stand ready to execute the warrant.

3. Plaintiffs have not received notice that they are to be evicted from the properties in question."

We are compelled to say that this allegation of non-receipt of notice could not have been an inadvertence of counsel. When the request for a stay was made to the writer of this opinion as Chief Judge of the Court of Appeals, the motion, again, was "based on the facts alleged in their complaint." It was only when the undisputed evidence as to notice already detailed was examined that the true facts came out, first to the single district judge, and then to the present writer.

In our opinion there has been a regrettable confusion in the mind of counsel between the duties of advocacy and the duty owed to the court. *See* F.R. Civ.P. 11. The explanation offered by counsel for the Boston Legal Assistance Project, initial counsel for plaintiffs, to the writer of this opinion, that, true, there had been notice, but not notice of the sort which he considered adequate under application of proper constitutional principles, is a far cry from the words of the complaint, "have not received notice," unexplained, and unqualified. If the complaint was misunderstood by the court, it was even more understandably,

and expectably, misunderstood by the media.

■ This brings us to counsels' next contention, which is that this is not a case of balancing of equities, and that whatever may be the irreparable injury to the BRA and the 210 families who will be served by the housing project if and when completed, is immaterial; that when constitutional rights are involved there are no equities. We unhesitatingly reject that contention. If and when we come to a further consideration of the statute, the statute presumably cannot be made constitutional by weighing individual equities.[6] This is not the equities that we are considering, but whether it is equitable to permit these plaintiffs to assert the alleged rights that they are now seeking at this particular time. Even the most basic constitutional rights may be waived. The plaintiffs, however regrettable for them individually that the public good requires them to be dispossessed, a regret that we can understand, have exercised abundant self-help of a purely negative character, but have done nothing hitherto to claim and protect their now alleged constitutional rights. Plaintiffs contend that they have ignored their rights for only two months. Even if that be accepted, two months is, in the terms of this case, a great deal of time.

Asked by this court what "property rights" plaintiffs were seeking to protect, counsel replied that it was not to be dispossessed until they had had legal notice, an offer of adequate relocation facilities, and the satisfaction of a due process hearing. However, to repeat, since August 22 when they were tendered, but refused, notice, and early September when notice was forced upon them, they have evidenced no such interest. Now, when the emergency has arisen and they have stalled until there is certainty that the project will falter, and grave danger that it will fail, they ask for what they term due process. We are little moved by the contention that one who has persistently evidenced no interest in whether he has been offered suitable relocation facilities has standing to claim that the statute is unconstitutional in that it provides no opportunity for a hearing.[7]

■ Approaching the question of whether plaintiffs have met the first requirement of a stay, namely, the likelihood of success, we find that there is little, if any, likelihood that they can show that they are now entitled to assert constitutional rights, whether the matter be phrased in terms of waiver, laches, or standing. We find no likelihood that, on the merits, they can show that the statute denies equal protection because of the statute for tenants under lease sought to be evicted for other than non-payment of rent. We find little, if any, likelihood that these particular plaintiffs have standing to complain that they should have received (even if, conceivably, it could be thought a constitutional matter) a 90 instead of a 30-day notice. Finally, we find little, if any, likelihood that these particular plaintiffs have standing to complain that the statute provides no hearing process as to whether they have been offered suitable relocation facilities. In sum, we

---

6. Non constat that the exercise of, say the police power, can be accomplished even though it effects uncompensated loss to private individuals for the public good.

7. Perhaps a footnote is warranted in connection with counsel's contention that plaintiffs were too poor to obtain counsel until just this moment, and did not know where to get one. We pass the fact that the leaders of the plaintiffs had counsel in 1966, a highly reputable attorney known to the court and currently active, who we feel certain would at least have referred plaintiffs to Legal Assistance counsel had they requested advice, and turn to the more substantive matter. We asked present counsel whether he was consulted as to how the plaintiffs could secure adequate relocation facilities, and he replied, no, on how they could stay where they were.

find it improbable, rather than probable, that they will succeed on the merits.

Turning to the other inquiry to be made in connection with the granting of a stay, the prospect of irreparable harm if one is refused, and correspondingly, of irreparable harm if one is granted, we find that any balance of the equities is grossly in plaintiffs' disfavor. The probability of irreparable injury to the BRA is enormous. We make a further finding. We doubt whether plaintiffs have shown any irreparable injury at all. The loss of plaintiffs' homes, if that were what is involved, would doubtless cause what in law is properly regarded as irreparable injury. That is not what is involved. Plaintiffs concede, as they must, that the loss of their homes is inevitable. The question is only one of timing, and of the adequacy of the facilities that they are offered in exchange. The length of time that plaintiffs can remain, even on their own claims, is, at best, short. Furthermore, plaintiffs have failed to satisfy us that they will not receive adequate relocation facilities. During the hearing counsel for the BRA stipulated in open court that the BRA would provide interim suitable and adequate accommodations, in a hotel or motel, for the period reasonably required to find appropriate relocation facilities, and to do whatever else the court should order. For how long we shall hold the BRA to this, if it should happen that plaintiffs fail to cooperate, including departing voluntarily, is for another day, but it presently exists.

We see no reason for a stay beyond Wednesday morning, October 29, at 9 o'clock. We select that date because counsel informs us, and we find, that if plaintiffs do not leave voluntarily at that time, they must be physically evicted forthwith, October 30 being the last day that the defendant must enter with equipment to clear the premises for the contractor, or lose its contract. It will be so ordered.